APPLEBEE'S NORTHEAST, INC. *vs.* METHUEN INVESTORS, INC.,
general partner,[1] & another.[2]

No. 98-P-1833.

,Essex. February 9, 1999. - May 17, 1999.

Present: Kass, Kaplan, & Jacobs, JJ.

*Landlord and Tenant,* Termination of lease, Surrender, Subletting. *Real Property,* Lease.

Discussion of cases considering the surrender of a prime lease and the consequent effect on sublessors of the property. [781-783]
The involuntary termination of a prime lease operated to terminate a sublease as well. [784]

CIVIL ACTION commenced in the Superior Court Department on June 24, 1997.

SUMMARY PROCESS. Complaint filed in the Lawrence Division of the District Court Department on December 1, 1997.

After transfer of the summary process action and consolidation in the Superior Court Department, the cases were heard by *Peter F. Brady,* J., on a motion for summary judgment.

*Eric F. Eisenberg* for the plaintiff.

*John D. Hanify* for the defendants.

KAPLAN, J. The question on appeal is the effect, in particular circumstances, of the termination of a prime lease upon the continued existence of a sublease. The question arises in the course of a refinancing and redevelopment of the Methuen Mall. To simplify the narrative, we use the name "Developers" to signify one or more of the three affiliated companies used to carry out the redevelopment plan.

To begin as of May, 1996. The fee title of the Methuen Mall site was held by Gilbert. G. Campbell and Charles T. Matses.

---

[1] Of Valley Partners Limited Partnership.
[2] Pleasant Valley Land Corp.

Metropolitan Life Insurance Co. (MetLife) was lessee of a ground lease of the site under the fee owners. This lease was long term, running to 2038, and had a purchase option. MetLife was lessor and Applebee's Northeast, Inc. (Applebee's), a national restaurant chain, lessee of one of the stores in the Mall (No. 103); this sublease had six years still to run, with two five-year renewal options. MetLife was fee owner of a parcel of some seven acres adjacent to the Mall, of which a portion was used for additional parking for the Mall and another portion was occupied by a Caldor store under lease from MetLife. The Teachers Insurance & Annuity Association of America (TIAA) had a mortgage of $14,000,000 in face amount encumbering the ground lease and the parking lot parcel. However, MetLife's obligations under the mortgage were "non-recourse," that is, MetLife's obligations were limited to the property mortgaged and the mortgagee could not reach any other MetLife assets. Such also was MetLife's situation regarding rent under the ground lease.

As of May, 1996, or thereabouts, the Mall was in sad array. The Sears department store, considered an "anchor" of the Mall, had vacated the property as early as 1992. Another anchor, Jordan Marsh, quit in 1994. Other stores followed. In fall, 1995, Ann & Hope, the remaining anchor, gave notice that it would leave by the end of the year. What had contributed steadily to the decline of the Mall was, no doubt, its proximity to the New Hampshire border, which beckoned to customers with the lure of freedom from sales tax.

It appears from the record that by spring, 1996, MetLife saw no profit or hope of future profit that could attract it to remain in the Mall or its environs; it wanted to shed itself of all involvement with the place. After May, 1996, MetLife, although as a corporation it was quite solvent, fell into default with respect to real estate taxes ($654,509) and mortgage payments ($671,384). It was also almost a year behind in ground rent. On June 14, 1996, Campbell and Matses gave formal notice of default to MetLife under the ground lease.

In this scene the Developers saw a prospect of eventual profit by dismantling the Mall and rebuilding it as an entertainment center with multiple features, to be called "The Loop." This meant, first, revising the legal structure.

Under agreement dating from October 23, 1996, the Developers, for a price of $4,412,921, bought TIAA's interest in the

mortgage above mentioned. About January 24, 1997, the Developers acquired the fee of the Mall site from Campbell and Matses for a price stated to be $100,000. An agreement dated March 20, 1997, between the Developers and MetLife, set out, with much elaboration, alternative options that the Developers might exercise in relation to MetLife. The Developers elected under the agreement, in substance, to take the step of foreclosing on the parking lot parcel. MetLife undertook to give a deed in lieu of foreclosure, and a quitclaim deed stating a consideration of $100,000 was duly delivered.

We reach the meat of this appeal, the disposition of the ground lease of the Mall site. The Developers, now lessors in their right under the acquisition of the fee from Campbell and Matses, gave notice on April 29, 1997, to MetLife of the termination of the ground lease because of MetLife's continued defaults. There was no resistance by MetLife; it had no interest in postponing the termination of the lease by invoking any cure periods, and waived these cures as it had previously waived the exercise of any option to purchase the fee. The termination of the ground lease was expected to have the effect of terminating Applebee's sublease, as the sublease was by its terms subordinate to the ground lease. The Developers sent Applebee's a notice to quit on May 7, 1997, demanding that it vacate the premises. At this point Applebee's evidently was the only remaining occupant in the Mall.

(We need not render in detail the further financing of the development by the introduction, or promised introduction, of more new money to extinguish the mortgage and to provide the capital for creating The Loop.)

Applebee's refused to comply with the notice to quit and on June 27, 1997, commenced an action in Superior Court against the Developers and MetLife seeking (among other things) a declaration that it had a valid lease (with the Developers as lessors). On December 1, 1997, the Developers brought summary process in Lawrence District Court to evict Applebee's. Upon motion by Applebee's, a judge of the Superior Court consolidated the summary process action with the declaratory action. The Developers moved for summary judgment on their claim for possession and on Applebee's declaratory claim. The court allowed the motion in the Developers' favor as prayed, and, on the Developers' further motion, unopposed, the court entered a

separate judgment under Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), accordingly on June 23, 1998. Applebee's appeals.[3]

The judge below wrote a marginal note: "Motion allowed for reasons articulated in its [presumably, Developers'] memorandum; voluntary surrender is *not* an issue" (emphasis in original). This laconic statement about voluntary surrender is correct in light of the record, but it requires explication.

1. We have first to shear away from the case Applebee's voluminous attempt to show a "conspiracy" of the actors — Developers and MetLife — somehow intended unjustly to eliminate the sublease. The attempt can be characterized by Applebee's assertion that MetLife represented to Applebee's that MetLife held the fee title to the site and the lease to Applebee's was a prime lease. Applebee's further suggests that it was kept in ignorance by MetLife of the fact that there was a mortgage encumbering MetLife's interest. The ground lease and the mortgage were matters of record, so the implication of deception would seem at least odd; but if such deception occurred, presumably it would not affect the Developers who could rely on the record.[4] Further, Applebee's proceeds to ignore, by its silence on the point, that MetLife was in a non-recourse position and, indeed, it seems to argue on an assumption that MetLife was personally liable. All this has the effect of distorting the motives and behavior of the Developers and MetLife in the transactions between them. It is true that the Developers and MetLife were not separated from each other by a hermetic seal. The parties exchanged information and cooperated in the sense in which creditors and debtors customarily cooperate: so, for example, in the agreement to give and to accept a deed in lieu of foreclosure of the parking lot parcel. But adjectival abuse of the parties does not make conspirators of them. We conclude, without going into superfluous detail, that this case is to be judged on the basic facts summarized above, without distraction by the claim of conspiracy which, in the judge's apparent view, and in our view, does not raise any issue that might compromise the summary judgment appealed from if the judgment is otherwise justified.

2. Where the judge spoke of "voluntary surrender" not being an issue, he did not mean to say simply that the parties acted

---

[3] Applebee's gave bond of $3,000,000 under G. L. c. 239, § 5, as a condition of pursuing its appeal.

[4] It is understood that Applebee's has instituted separate suit against MetLife.

consciously and volitionally — although that was true. The judge was referring to certain postulated rules of law and indicating that the Developers and MetLife were not in breach of them.

When a prime lease is terminated (or otherwise fails) a sublease subordinate to the prime ordinarily terminates (or fails): that is part of the common understanding of "subordinate." Thus if the prime lease suffers forfeiture because the lessee does not pay the rent, one expects the sublease to crash with the prime. More generally, where a prime ends in accordance with its terms, express or implied, the sublease has to submit to the same fate: this is expectable and the subtenant cannot fairly complain.

Suppose, however, that the fee owner and the prime lessee agree, outside the terms of the prime lease, to end or cancel it. Here we begin to be troubled about the fairness of holding that the sublease is thereby defeated. If we add to the hypothetical that the two parties have gotten together in a deal to try to oust the subtenant, we may be troubled to the point of deciding that the sublease should survive (now subordinate to the fee owner if the termination of the prime lease stands). In the situations supposed, when the termination of the prime lease occurs by act of the parties outside the terms of that lease, we can say (with some awkwardness) that the surrender foisted on the sublessee would be coming about by "voluntary" acts of the fee owner and prime lessee — whereas in case of ordinary forfeiture the surrender is by operation of the lease and the law and so is "involuntary."

What we have labored to describe is put shortly by Chief Justice Wheeler in *Golde Clothes Shop, Inc.* v. *Silver*, 95 Conn. 678, 685-686 (1921):

> "A voluntary surrender by a principal lessee to a principal lessor, effected in a manner contrary to the provision of termination in the lease, does not affect the rights of a tenant acquired under a sublease which the lessor had authority to make."

(As will appear, the actual surrender in the *Golde* case was held "involuntary because legally enforceable." 95 Conn. at 687.)

3. *To survey the cases cited and discussed by the parties.* There is not much law in the Commonwealth on surrenders,

voluntary and involuntary; but what there is conforms to the doctrine encapsulated in *Golde*. In *Albiani* v. *Evening Traveler Co.*, 220 Mass. 20 (1914), a prime lessee surrendered to the lessor. The court said (at 26):

> "The contention of the defendants [prime lessors] that this constituted in effect an entry for breach of condition cannot be supported. . . . The payment of the large sum of money concurrently with the release of that company [prime lessee] from the covenants of the lease, in the light of the written agreement which in terms is a surrender, in connection with all the other circumstances forbids that inference. . . .
>
> "The plaintiffs [sublessees], therefore, had a valid lease from the tenant of the defendants . . . ."

One regrets that the court did not elaborate on the doctrine; rather it assumed it. *Carlton Chambers Co.* v. *Trask*, 261 Mass. 264 (1927), holds merely that no surrender had occurred. In *Ahmed & Cesare, Inc.* v. *Watertown Arsenal Assocs.*, 29 Mass. App. Ct. 923, 926 (1990), a Florida court, in proceedings there on an assignment for the benefit of creditors, had rejected the primary lease: this, not surprisingly, was treated as a forfeiture under the lease and was thus an involuntary surrender, so the sublease crashed: "upon the rejection of the primary lease, Watertown [prime lessor] was entitled to possession against A & C, now a tenant at will." (The *Albiani* case was cited.)

The prime lessor in the *Golde* case in Connecticut terminated the lease upon events permitting termination as prescribed in the lease, except that the surrender by the lessee occurred "eleven days before the four months' period of notice had expired. This provision does not affect the right to terminate. It exists for the benefit of the tenant and may be waived by him." 95 Conn. at 686. Thus the surrender was involuntary and the sublease ended. *Bargain Mart, Inc.* v. *Lipkis*, 212 Conn. 120 (1989), is complicated by a provision of the current Bankruptcy Code about rejection of leases; the court announces its allegiance to *Golde* and appears to hold that, where ground for termination under the terms of the prime lease does not clearly exist, an agreement by the parties to that lease to end it is "voluntary" and a sublease survives.

New York with the leading case of *Eten* v. *Luyster*, 60 N.Y. 252 (1875), has long observed the voluntary-involuntary distinction. *Da Costa's Automotive, Inc.* v. *Birchwood Plaza Shell, Inc.*, 106 A.D.2d 484 (N.Y. 1984), records an involuntary surrender — one not pursuant to any provision of the lease — which left the sublease intact. The same situation is reflected in *Ocean Grille, Inc.* v. *Pell*, 226 A.D.2d 603 (N.Y. 1996).[5] In *Lippe* v. *Professional Surgical Supply Co., Inc.*, 132 Misc. 2d 293 (N.Y. Civ. Ct. 1986), termination of the prime lease was warranted by default under the provisions of the lease. The termination was accomplished by stipulation of lessor and lessee in the course of litigation as a shortcut to avoid further hassle. Thereupon a sublease failed and the sublessee held over only as a tenant at sufferance.

Under the terms of the prime lease in *Fifth & Broadway Partnership* v. *Kimny, Inc.*, 102 Cal. App. 3d 195 (1980), commencement of an unlawful detainer action by the plaintiff prime lessor against the defendant subtenant amounted to a three-day demand for payment of overdue rent. With the rent still unpaid, the parties to the prime lease entered into a settlement agreement terminating the lease. The sublessee protested that this consensual arrangement should count as a voluntary surrender. The court responded (at 203) with the following from *Herman* v. *Campbell*, 86 Cal. App. 2d 762, 766 (1948): "Where a cause of forfeiture has arisen, the fact that the lessee consents to the enforcement of the forfeiture does not render the transaction a surrender as distinguished from a forfeiture so as to bring it within the rule that a lessee cannot by a surrender affect the estate or the interest of third persons held under him." The sublease collapsed and the prime lessor was put in possession.

Again in *Thal* v. *S.G.D. Corp.*, 625 So. 2d 852 (Fla. Dist. Ct. App. 1993), review dismissed, 632 So. 2d 1027 (1994), when the lessee of the prime lease defaulted in paying property taxes as required, the lessor started eviction proceedings against the lessee and a sublessee. The parties to the prime lease entered into an agreement settling the eviction action between them and agreeing to treat the lease as cancelled. The court said, at 853, "The fact that this suit was settled, rather than pursued to a final judgment, does not convert the outcome from a cancellation into a voluntary surrender," citing the *Fifth & Broadway* and *Lippe* cases.

---

[5]The exposition in *Unionport Stores, Inc.* v. *Parkchester S. Condominium, Inc.*, 205 A.D.2d 385 (N.Y. 1994), is uninformative.

4. The model of a voluntary surrender is a case where the lessee of a prime lease yields its place and withdraws from the lease in exchange for the lessor's agreement not to enforce the lessee's personal liability under the lease. The lessor's purpose may be to try to destroy a sublease and deal otherwise with the property; on the lessee's side there may be a wish or need to be relieved of the burden of debt. Compare the *Albiani, Bargain Mart*, and *Da Costa's* cases. On the undisputed facts, the present case is far removed from the model. There were plenty of defaults under the ground lease and no basis for questioning or invalidating the notice of termination delivered to MetLife. Applebee's points to MetLife's waiver or omission to take advantage of cure periods as evidence of a voluntary surrender, but the point is answered in the *Golde* case. The fact that the termination was carried out cooperatively, without litigation or other controversy, is not material where plain grounds for forfeiture existed. Compare the *Lippe, Fifth & Broadway*, and *Thal* cases. Reinforcing the involuntary nature of MetLife's surrender (to continue to use the venerable nomenclature) is the fact that MetLife appears to have resolved to depart from the Mall even before the refinancing effort got underway, and the further fact that MetLife was not relieved by the termination of personal liabilities, for it had none. MetLife could tend to its own affairs and plans and was under no duty at its own cost to avert the termination of its lease in order to save Applebee's sublease. It would not affect the validity of the termination that MetLife might have wished the Developers well in their plans to renew the Mall, although the record is silent on the point.

With greater foresight and caution, Applebee's would have paid attention to the documents of record before accepting the sublease, and in any event could have insisted on a "non-disturbance" provision that would protect against termination of the sublease through involuntary surrender of the ground lease (which would mean, in theory at least, their having to pay a higher rent).

*Judgment affirmed.*