## TRACE CONSTRUCTION, INC. *vs.* DANA BARROS SPORTS COMPLEX, LLC, & others[1] (and five companion cases[2]).

Bristol. January 4, 2011. - April 13, 2011.

Present: IRELAND, C.J., SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.[3]

*Contract,* Construction contract. *Lien. Mechanic's Lien.*

This court concluded that under G. L. c. 254, § 2, a contractor can establish a valid lien on a property interest when he or she contracts with a person acting with the consent of the owner of that property interest. [351-353]

This court concluded, based on the sum of the evidence in civil actions brought by two plaintiff contractors to enforce liens on real property pursuant to the mechanic's lien statute, G. L. c. 254, that the contractors performed work with the consent of the owner of the real property for purposes of G. L. c. 254, § 2, and had a valid lien on the owner's fee interest. [353-356]

This court declined to interpret G. L. c. 254, § 4, as allowing liens to be created on all the property on which a lien can be created under G. L. c. 254, § 2, given that the subcontractor's lien under § 4 is limited to the property owned by the party who entered into the original contract and does not extend to property owned by a person for whom, on whose behalf, or with whose consent the contract was made. [356-357]

At the bench trial of civil actions brought by plaintiff contractors and subcontractors to enforce liens against, inter alia, a leasehold interest in real property, pursuant to the mechanic's lien statute, G. L. c. 254, the judge erred in concluding that the tenant's surrender of the leasehold to the lessor should be considered voluntary, given the tenant's default on its rent obligations, its apparent inability to pay its expenses, and the absence of a collusive agreement between the tenant and the lessor; therefore, this court concluded that any lien that may have been validly created on the leasehold interest thus terminated with the end of the lease. [357-359]

This court concluded that the mechanic's lien statute, G. L. c. 254, in describing the real property, land, building structure, or improvement on which a lien may be claimed, is best read as preserving a parallel reference to the real property on which work may be performed, and not as extending mechanic's liens beyond real property to the individual items furnished in construction. [359-360]

---

[1]Dana Barros and Richard J. Madigan, trustee of Oxford Road Realty Trust; O'Connor Door Corp., intervener.

[2]CB Seating, Inc. *vs.* Dana Barros & others; CB Seating, Inc. *vs.* Dana Barros & others; L.C. Anderson, Inc. *vs.* Trace Construction, Inc., & others; L.C. Anderson, Inc. *vs.* Trace Construction, Inc., & others; Quinn Brothers of Essex, Inc. *vs.* Trace Construction, Inc., & others.

[3]Justice Cowin participated in the deliberation on this case and authored this opinion prior to her retirement.

CIVIL ACTIONS commenced in the Superior Court Department on June 6, June 16, August 22, and November 3, 2005, respectively.

After consolidation, the case was heard by *Richard T. Moses*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Warren H. Brodie* for Trace Construction, Inc.

*John M. Curran* (*Carolyn M. Francisco* with him) for L.C. Anderson, Inc.

*Leonard F. Zandrow, Jr.* (*John W. Brister* with him) for Richard J. Madigan.

*John S. Reidy*, for CB Seating, Inc., was present but did not argue.

*James G. Grillo & Scott K. Semple*, for Quinn Brothers of Essex, Inc., submitted a brief.

COWIN, J. These cases, which were consolidated for trial, involve contractors and subcontractors who claim liens, pursuant to the mechanic's lien statute, G. L. c. 254, on real property owned in fee by Richard J. Madigan.[4] The contractors are Trace Construction, Inc. (Trace), and CB Seating, Inc. (CB Seating); the subcontractors, both of whom performed work for Trace, are L.C. Anderson, Inc. (Anderson), and Quinn Brothers of Essex, Inc. (Quinn). The contractors were engaged by Dana Barros Sports Complex LLC (Complex), a company owned by Dana Barros, to perform renovations on premises that Dana Barros Basketball Camp, LLC (Camp) had leased from Madigan.[5] The Complex failed to make payments to the contractors for work performed, and the contractors and subcontractors filed notices of liens on the property pursuant to G. L. c. 254, § 2 (governing contractors' liens), and G. L. c. 254, § 4 (governing subcontractors' liens). The Camp also fell behind on lease payments to Madigan, and ultimately surrendered possession of the premises to him. The contractors and subcontractors brought

---

[4]The property in question has been owned by Madigan since 1983. In 2004, Madigan conveyed the property to Oxford Road Realty Trust, of which Madigan is trustee.

[5]As discussed *infra*, Dana Barros Basketball Camp, LLC (Camp), is an entity formed and controlled by Barros.

these actions to enforce the liens against both the Camp's lease-hold interest and Madigan's fee interest.[6] Following a jury-waived trial, a Superior Court judge determined that the contractors and subcontractors had established valid liens against the leasehold interest, but denied all claims asserting liens against Madigan's fee interest.[7] The contractors, subcontractors, and Madigan appealed to the Appeals Court, and we transferred the case here on our own motion.[8]

We conclude that the contractors have a valid lien on Madigan's fee interest. We conclude also that any lien that may have been validly created on the leasehold interest was terminated when the Camp's leasehold was surrendered. We thus reverse the decision of the trial judge that each of the contractors and subcontractors had established liens on the leasehold interest. We affirm the judge's conclusion that the subcontractors did not establish a lien on Madigan's fee interest.

1. *Background.* The real property at issue in this case consists of two adjoining parcels of land, one situated in Foxborough and the other in Mansfield, and a 70,000 square foot building located on the parcels. Madigan has owned the property since 1983, and he operated an indoor tennis club in the building until 1989. Madigan thereafter moved his wholesale paper business into the building, operating 7,000 square feet of the building as offices and 50,000 square feet as warehouse space, which was heated, lighted, and outfitted with storage racks. In 1996, he sold his business to Georgia Pacific and leased the premises to that company until 2000. The building then remained vacant until 2004.

Dana Barros, a former professional basketball player, operated a basketball camp prior to his dealings with Madigan, and

---

[6]O'Connor Door Corporation's motion to intervene in one action was allowed by a Superior Court judge.

[7]The judge accordingly ordered the leasehold sold and the proceeds distributed in accordance with G. L. c. 254, § 21.

[8]Madigan appealed the portions of the judge's decision in which the judge decided that (1) an alleged misnomer in the notices and filings was not fatal to the contractors' and subcontractors' claimed liens; and (2) the surrender of the leasehold was voluntary. We do not reach the former issue because it is moot in light of our related conclusions in this case. The latter issue is discussed *infra.* Madigan argued in the alternative that the judge ruled properly that the contractors' and subcontractors' liens were limited to the leasehold interest.

had established the Camp in 2002 for that purpose. In 2004, Barros and Madigan held a series of discussions in which Barros told Madigan that he was interested in opening a sports complex on the premises and that he intended to make improvements for that purpose, but did not provide substantial detail prior to signing the lease.

Madigan and the Camp entered into a five-year lease agreement that began on September 1, 2004, and that provided the Camp with an option to renew the lease for two five-year periods. The lease provided that all of the Camp's "alterations, improvements, additions and/or renovations," with the exception of personal property, equipment, and trade fixtures that were removable "without material damage" to the premises, were for Madigan's benefit and were not the property of the Camp. The Camp was required to obtain Madigan's written consent for any such alteration.

After securing the lease, Barros formed the Complex. The Complex entered into a contract with Trace in November, 2004, to perform extensive alterations and improvements to the premises, including plumbing, lighting, HVAC, and electrical work. Trace entered into subcontracts with Anderson and Quinn soon thereafter. The Complex also entered into a contract with CB Seating in January, 2005, for the installation of basketball equipment, gymnasium dividers, and other miscellaneous items.

Trace began performance and sent periodic applications for payment to the Complex. By the time of Trace's fifth application, the Complex was late in making payment. Trace informed the Complex in a notice dated March 23, 2005, that it would cease work within seven days if the balance remained unpaid. Shortly thereafter, in a letter dated March 30, 2005, Trace informed the Complex that it had ceased work. CB Seating performed in full, completing its work in May, 2005. The contractors and subcontractors each claim unpaid balances for work performed.

The work on the premises was sufficiently complete for the Camp and the Complex to occupy the premises in the spring of 2005. The Camp had persistent difficulties in making lease payments to Madigan, however, and in April, 2006, Barros executed a "Surrender of Possession" document on behalf of the Camp and Complex and presented it to Madigan. Madigan accepted it

without objection, and the Camp and the Complex vacated the premises.

Madigan continued to operate the facility as a means of generating income from the property and retained some of the employees who had worked for the Complex for that purpose. Within several months after the surrender, Madigan leased the property to a company known as BOAH, LLC (BOAH). That entity operated a fitness center at the premises for approximately eighteen months, after which time BOAH vacated and Madigan again took back operation of the facility. Madigan continued to operate it at the time of trial while seeking potential buyers.

Each of the contractors and subcontractors filed a notice of contract and statement of account in the Bristol County or Norfolk County registry of deeds as required by the mechanic's lien statute. See G. L. c. 254, § 2 (notice of contract requirement for contractors); G. L. c. 254, § 4 (notice of contract requirement for subcontractors); G. L. c. 254, § 8 (statement of account for all mechanic's liens). Each also filed and recorded a complaint as required by the statute. See G. L. c. 254, § 11. There is no dispute that the contractors and subcontractors have made the appropriate filings for creating a mechanic's lien.

After the contractors and subcontractors filed these complaints, Madigan brought a separate action pursuant to G. L. c. 254, § 15A,[9] for summary discharge of the liens, arguing that, as he was not a party to the contracts with the contractors or subcontractors, the lien could not attach to his fee interest in the property. See *Madigan* v. *Trace Constr., Inc.*, 71 Mass. App. Ct. 1, 2 (2007). A Superior Court judge dismissed the complaint, concluding that summary discharge was not appropriate and that the contractors and subcontractors were entitled to discovery in

---

[9]That section provides, in relevant part:

> "If any person in interest, including but not limited to an owner, . . . claims [that] . . . (*b*) it appears from the notice of contract or a statement of account that the claimant has no valid lien by reason of the character of, or the contract for, the labor or materials or rental equipment, appliances or tools furnished and for which a lien is claimed, . . . such person may apply to the superior court for the county where such land lies . . . for an order . . . (ii) summarily discharging of record the alleged lien or notice as the case may be. . . ."

G. L. c. 254, § 15A.

the matter. *Id.* The Appeals Court affirmed the judgment of dismissal. *Id.*

A jury-waived trial of the contractors' and subcontractors' claims was held in the Superior Court in December, 2008. By the time of trial, the issues remaining to be resolved were whether the contractors and subcontractors had established valid liens pursuant to G. L. c. 254 and, if they had done so, what the nature and amounts of those liens were. As stated, the trial judge ruled that the contractors and subcontractors had established valid liens on the leasehold interest of the Camp but that they had not established a lien on the fee interest of Madigan.

2. *Discussion.* We review the trial judge's finding of facts for clear error. See *Commissioner of Revenue* v. *Comcast Corp.*, 453 Mass. 293, 302 (2009); Mass. R. Civ. P. 52(a), as amended, 423 Mass. 142 (1996). We review the judge's rulings on questions of law de novo. See *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 456 Mass. 562, 569 (2010), citing *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004).

A mechanic's lien is a creation of statute and can be enforced only by strict compliance with the statute. *National Lumber Co.* v. *United Cas. & Sur. Ins. Co.*, 440 Mass. 723, 726 (2004). The mechanic's lien statute contains separate provisions governing the creation of liens in favor of contractors, G. L. c. 254, § 2, and liens in favor of subcontractors, G. L. c. 254, § 4. As noted, the contractors and subcontractors each claim liens on the fee interest, and Madigan challenges the judge's conclusion regarding the liens on the leasehold interest. We address each in turn.

We examine first the contractors' assertions that they have perfected liens on Madigan's fee interest. The provision of the mechanic's lien statute governing contractors' liens outlines both (1) the persons with whom a lien claimant can contract, and (2) the property that is thereby subject to a mechanic's lien. Both are addressed in a single statutory sentence, which provides:

> "A person entering into a written contract with the owner of any interest in real property, or with any person acting for, on behalf of, or with the consent of such owner for [relevant work] shall have a lien upon such real property . . . owned by the party with whom or on behalf of whom the contract was entered into . . . ."

G. L. c. 254, § 2. As Madigan is the owner of a fee interest in the real property at issue, he is the "owner of any interest in real property," and the contractors would be eligible to claim a lien if the Complex acted "with the consent" of Madigan in entering into the contracts.[10,11]

Although Madigan does not contest that the earlier portion of the statutory sentence mentions those contracting "with the consent of" the owner, he claims that the latter part of the sentence — the part that describes the property subject to the lien — encumbers only the property of a person "with whom or on behalf of whom" the contract was entered into. See G. L. c. 254, § 2. Madigan's argument implies that, as this latter language does not specifically include the property of owners who gave "consent" to a contracting party, the lien cannot attach to his fee interest.

We do not agree. "It is [an] elementary rule of statutory construction that a statute should not be read in such a way as to render its terms meaningless or superfluous." *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 268 (1991), citing *Globe Newspaper Co.* v. *Commissioner of Revenue*, 410 Mass. 188, 192 (1991). If we were to accept Madigan's implied construction, the references to persons acting "for" and "with the consent of" the owner in the earlier portion of the relevant sentence would be rendered meaningless by their exclusion from the latter portion of that sentence. We conclude rather that the term "on behalf of" in the latter portion of the sentence serves to paraphrase the earlier reference to persons "acting for, on behalf of, or with the consent of" the owner. As such, a contractor can establish a valid lien on a property interest when he or she contracts with a person acting with the consent of the owner of that property interest.

---

[10]The Superior Court judge concluded that the reference in the statute to "any interest in real property" was limited to the Camp's or Complex's leasehold interest and did not extend to the fee interest. The judge concluded further that the reference to "such owner" was limited to owners entering into a written contract. On that basis, the judge concluded that the lien could not attach to Madigan's fee interest. We do not find support for such a restrictive reading of facially broad language.

[11]While G. L. c. 254, § 2, requires that the contractor enter into a "written contract" for the work that gives rise to a mechanic's lien, it does not require that the owner's consent be written.

This conclusion is reinforced by reference to the statutory history of the relevant language. Prior to an amendment in 1996, the relevant provision read:

> "A person entering into a written contract *with the owner* of land for the whole or any part of the erection, alteration, repair or removal of a building or structure upon land, or for furnishing material therefor, shall have a lien upon said building or structure and *upon the interest of the owner* in said lot of land . . ." (emphasis added).

G. L. c. 254, § 2 (1994 ed.). The 1996 amendment thus expanded the class of persons with whom one could contract and whose property interests could be encumbered. See St. 1996, c. 364, § 2 (introducing current relevant statutory text). We are mindful of that legislative purpose in interpreting the terms of the statute.

This history also reveals that the language in the latter part of the sentence — the portion that Madigan claims is restricting — was added by the Legislature at the same time as the consent language was added in the earlier portion. This makes a harmonious reading of the two provisions more natural than might be the case if, for example, both portions of the sentence had been similarly expanded and a subsequent revision then narrowed the latter portion. We conclude that the contractors can establish a mechanic's lien on Madigan's fee interest if Madigan consented to the Complex's contract for work.

We accordingly turn to the question of Madigan's consent to the contracted work that was the source of the liens at issue. Our cases have explored the meaning of "consent" in mechanic's lien statutes on a number of occasions. Factors that have been discussed in those inquiries include the parties' contemplation of the work at the time of the lease or sale agreement, an expectation or requirement in the lease or sale agreement that work will be performed, and the presence of a potential benefit to the owner from the work.

In *Francis* v. *Sayles*, 101 Mass. 435, 439 (1869),[12] we held that an owner did not consent to work that was undertaken by a

---

[12]Much of the case law reviewed here dates from the late Nineteenth Century. At that time, the relevant section of the mechanic's lien statute allowed for liens where labor or materials were furnished "by consent of" the owner of

sublease tenant. The lease in that case provided for particular construction work to be done by the lease tenant, but not for the work eventually undertaken by a sublease tenant that gave rise to the lien. See *id.* 435-436, 439. The fact that the lessor may have been aware of the sublease tenant's work once undertaken, and that she did not object, did not establish the consent required to create a lien on her interest. See *id.* at 439.

Likewise, we have held that an owner who entered into a contract to sell real estate did not consent to work undertaken by the buyer prior to the buyer's receipt of the deed. *Hayes* v. *Fessenden*, 106 Mass. 228, 230 (1870). That was true even though the owner knew of the buyer's intent to build on the land, knew of the progress of work prior to delivering the deed, and did not object. See *id.* at 229-230. See also *Saunders* v. *Bennett*, 160 Mass. 48, 49 (1893) (owner's knowledge that buyer in possession was undertaking work prior to receiving deed, and owner's discussion with buyer about furnishing frame for house, did not import consent for purpose of mechanic's lien statute).

By contrast, in *Roxbury Painting & Decorating Co.* v. *Nute*, 233 Mass. 112, 114, 118 (1919), we held that a mechanic's lien could be enforced against an owner's interest as a result of work undertaken by a person who had entered into a contract to buy the property. As in prior cases, the owner's awareness of the buyer's intention to undertake work on a house, and the owner's knowledge of the progress of that work, were not sufficient to establish consent. See *id.* at 115-116. However, there was evidence that the house was initially in an uninhabitable condition, and that there was an agreement with the owner that the buyer would renovate it to secure the mortgage money needed to pay the purchase price at closing. See *id.* at 116. The possibility of such an agreement, we concluded, was sufficient

property, and we construed the meaning of "consent" in our cases. See Gen. St. 1860, c. 150, § 1; Pub. St. 1882, c. 191, § 1; Rev. L. c. 197, § 1 (1902). In 1916, the mechanic's lien statute was amended to provide separate sections for mechanic's liens for labor and mechanic's liens for contractors, and the latter did not mention consent. St. 1915, c. 292, §§ 1, 2. The 1996 amendments reinserted "consent" as a basis for a contractor's mechanic's lien, and we are again asked to construe that term within the meaning of the statute. See St. 1996, c. 364, § 2.

to vacate a verdict ordered for the owner by a Superior Court judge. See *id.* at 114.

To conclude that a person has consented within the meaning of the mechanic's lien statute, we have thus required something more than awareness of an intent to perform work, or awareness of ongoing work, and a failure to object. In the present cases, prior to agreeing to a lease, Madigan and Barros had discussed Barros's plans to hold his basketball camp in the building, and Barros told Madigan that he planned to renovate the building for that purpose. Madigan visited the site while work was ongoing on a few occasions, and saw the building regularly on his commute to work. He never objected to the renovations. Those facts, standing alone, may well fall short of establishing Madigan's "consent" under our prior case law.

However, the lease also included a provision stating that the premises could only be used as a "recreation facility." At the time of the lease agreement, the building had been vacant for four years, and its prior use was as a warehouse for storage of paper products, with a core area of office space. Although the use provision in the lease did not strictly require renovation to make the warehouse suitable for use as a recreation facility, the terms did make such renovation exceedingly likely given the then-existing condition of the premises.

The lease also provided that any such "alterations, improvements, additions and/or renovations," with the exception of personal property, equipment, and trade fixtures removable without material damage to the premises, were to "remain for [the] benefit of [Madigan] and the demised premises and shall not be deemed the property of the [Camp]." That provision, in combination with the use restriction, made it inevitable at the time of the lease that Madigan would have the option to own the renovations undertaken to convert the space into a recreation facility. Any such improvement also required Madigan's consent under the terms of the lease — albeit with the qualification that such consent could not be "unreasonably withheld" — and, as stated, Madigan never objected, on this basis or any other, to the ongoing renovations.

Finally, Madigan testified that he "priced the rent relatively low at the time." He explained that "we felt that . . . if [Barros]

made the investment in the property, we would give him an attractive rent."

Madigan's conduct thus went beyond silent acquiescence in Barros's undertaking. The provisions of the lease and the pricing agreement evidence contemplation and active encouragement of renovation investments in the property that would, at Madigan's election, remain for his benefit. We conclude, based on the sum of the evidence, that the work was performed "with the consent of" Madigan for purposes of G. L. c. 254, § 2, and that the contractors have a valid lien on Madigan's fee interest.

We turn now to the subcontractors' claims of liens on the fee interest, which are governed by G. L. c. 254, § 4.[13] That section provides that, upon proper filing of notices, "the subcontractor shall have a lien upon such real property, land, building, structure or improvement owned by the party who entered into the original contract." *Id.* This provision is notably distinct from § 2, the provision governing contractors, in that the subcontractor's lien is limited to the property owned by the party who entered into the original contract; it does not extend to the property owned by a person for whom, on whose behalf, or with whose consent the contract was made. As the party who entered into the original contract — the Complex — was not a fee owner, the subcontractors' lien, by the terms of the statute, does not extend to the fee interest.

The subcontractors urge us to interpret § 4 as allowing liens on all of the property on which a lien can be created in § 2. We decline. Section 4, like § 2, was revised in 1996. See St. 1996, c. 364, §§ 2, 5. Whereas the older version of § 4 granted subcontractors a lien "upon the building or structure, and upon the

---

[13]General Laws c. 254, § 4, states, in relevant part:

"Whoever furnishes labor, including subcontractor construction management services, or who furnishes material, or both labor and material . . . under a written contract with a contractor, or with a subcontractor of such contractor, may file or record in the registry of deeds . . . a notice of his contract. . . .

"Upon filing or recording a notice, as hereinbefore provided, and giving actual notice to the owner of such filing, the subcontractor shall have a lien upon such real property, land, building, structure or improvement owned by the party who entered into the original contract as appears of record at the time of such filing. . . ."

interest of the owner," G. L. c. 254, § 4 (1994 ed.), the current statute grants a lien "upon such real property, land, building, structure or improvement owned by the party who entered into the original contract." G. L. c. 254, § 4. That change, undertaken at the same time as the revision of § 2, did not extend the class of property eligible for subcontractors' liens as far as the property eligible for contractors' liens in § 2.

The Legislature may well have chosen to treat subcontractors differently as a result of subcontractors' more attenuated relationship with the owner of property, or with the understanding that subcontractors would enjoy broader protection by virtue of their claims against the general contractor. Whatever the rationale, we will give effect to the plain meaning of the text where, as here, the chosen language does not produce an illogical result. See *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001).

We now address the judge's conclusion that the contractors and subcontractors established valid liens on the Camp's leasehold interest, a conclusion that Madigan challenges on appeal. A threshold question with respect to any such lien is whether a valid lien on the leasehold would survive the surrender of the lease to Madigan. We conclude that it would not.

As a general matter, a lien on a leasehold is extinguished when the rights of the lessee expire. See Annot., Enforceability of Mechanic's Lien Attached to Leasehold Estate Against Landlord's Fee, 74 A.L.R.3d 330, § 7[a] (1976 & Supp. 2010). By contrast, where the leasehold is conveyed from one tenant to another, a leasehold remains in existence and will continue to be encumbered; the statute states this latter principle explicitly with respect to mechanic's liens. See G. L. c. 254, § 23.[14] The

---

[14]That section provides:

"If the person for whom the labor has been performed or furnished or the material has been furnished dies or conveys away his estate or interest before the commencement of a civil action to enforce a lien, it may be commenced and prosecuted against his heirs or against the persons holding the estate or interest which he had in the land at the time when the labor or material was performed or furnished. If the action was commenced in the lifetime of such person, it may be prosecuted against his executor, administrator, heirs or assigns as if the estate or interest has been mortgaged to secure the debt."

G. L. c. 254, § 23.

distinction between these two circumstances may be ambiguous where, as here, a leasehold is surrendered[15] to the lessor.

That ambiguity can be resolved by determining whether the surrender of the lease is most accurately characterized as voluntary or involuntary. See *Applebee's Northeast, Inc.* v. *Methuen Investors, Inc.*, 46 Mass. App. Ct. 777, 781, 784 (1999). With respect to the Camp's performance under the lease, the trial judge found that:

> "[I]n addition to being unable to pay contractors all that was owed, the payment of rent under the lease became a matter of difficulty.

> "In a relatively short amount of time, Camp . . . had defaulted resulting in Madigan drawing down on a letter of credit in the amount of $75,833 . . . .

> "Finally, it was apparent that Barros could no longer continue meeting expenses for the Complex and vacated the premises in March or April of 2006."

The judge thus found that the Camp had defaulted on the payment terms and that the subsequent surrender followed from Barros's inability to meet the expenses of the Complex. These findings are consistent with the "constant shortfall" in rent payments described by Madigan in his testimony and the language of the lease regarding default, and we find no error in the judge's findings in that respect.

The judge did not find a collusive scheme between Madigan and Barros to construct the Complex and subsequently evade the lienholders; rather, "[f]rom the inception of his dealings with Barros, Madigan's main hope was that Barros would succeed at the Complex and continue to pay rent for the duration of the lease and the option periods."

Given the Camp's default on its rent obligations, the Complex's

---

[15]We do not think the fact that Barros, acting on behalf of the Camp and Complex, and Madigan termed the agreement a "surrender" of the lease to Madigan compels a conclusion that this was, in substance, a conveyance, as Quinn implies. Whether the use of the term "surrender" can be read as Quinn suggests, the substance of the transaction — not the terminology — controls the outcome in this context.

apparent inability to continue to pay its expenses, and the absence of a collusive agreement between Barros and Madigan, we think the judge erred in his conclusion that the surrender of the lease should be considered voluntary. The fact that the parties agreed to a surrender of the lease, rather than having Madigan provide a notice of default, observe a five-day waiting period, and thereafter provide a notice of termination, does not change the substance of the transaction in this case. See *Applebee's Northeast, Inc.* v. *Methuen Investors, Inc., supra* at 784 ("The fact that the termination was carried out cooperatively, without litigation or other controversy, is not material where plain grounds for forfeiture existed").

Quinn argues that Madigan's operation of the facility after the surrender supports a conclusion that the leasehold was voluntarily surrendered. In light of the absence of evidence of collusion, we do not think that Madigan's subsequent estimation that the most profitable use of the property was its continued use as a recreation facility compels a finding that the prior surrender of the lease was voluntary.

Any lien that may have been validly created on the leasehold interest thus terminated with the end of the lease. As a consequence, we do not reach the parties' dispute regarding the claimed validity of the contractors' and subcontractors' liens on the leasehold at the time of the relevant filings.

Finally, Trace and Anderson allege that they have established liens on the individual improvements to the real property. Trace notes that § 2 provides that a lien claimant "shall have a lien upon such real property, land, building, structure or improvement owned by the party with whom or on behalf of whom the contract was entered into . . . ." G. L. c. 254, § 2. Section 4 contains similar language. See G. L. c. 254, § 4 ("the subcontractor shall have a lien upon such real property, land, building, structure or improvement owned by the party who entered into the original contract").

That language, in describing "such" real property, land, structure, or improvement, refers back to the prior recitation of those items in the provision defining the type of work eligible for a mechanic's lien. The eligible work includes the "erection, alteration, repair or removal of a building, structure, or other

improvement to real property." G. L. c. 254, § 2. See G. L. c. 254, § 4. We think the statute is best read as preserving a parallel reference to the real property on which work may be performed, and not as extending mechanic's liens beyond real property to the individual items furnished in construction.[16]

To hold otherwise, moreover, would have the potential to disrupt the secured transactions regime elaborated in art. 9 of the Uniform Commercial Code as codified in Massachusetts law. See G. L. c. 106, §§ 9-101 et seq. Had the Legislature intended to implement a change of that magnitude, it would have made such an intent clear.

3. *Conclusion.* We conclude that contractors Trace and CB Seating hold valid liens on Madigan's fee interest in the subject property, and that no other valid liens are held by the contractors or subcontractors in these cases. Accordingly, the judgments that Trace, CB Seating, Quinn, and Anderson have established valid liens on the leasehold interest are reversed, and the orders pertaining to the sale of the leasehold are vacated. We remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[16]It is notable, in that regard, that although the description of the eligible work also included the "furnishing [of] material" for the work, the mechanic's lien is not extended to such material. G. L. c. 254, § 2.