NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-931

EDWARD J. MORIARTY & another[1]

vs.

EDMOND L. RESOR, trustee,[2] & others.[3]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This case concerns the validity and scope of an easement the defendants claim to have over the plaintiffs' property in the town of Lexington (town). The plaintiffs, Edward Moriarty and Emily McPhillips, challenge the right of the defendants to use the driveway located on the plaintiffs' property to access all of the defendants' property from the public way. In counterclaims, the defendants seek a declaration of their easement rights and contend that Moriarty and McPhillips have

---

[1] Emily C. McPhillips.

[2] Of the Bushnell Trust under a declaration of trust dated September 27, 2005.

[3] Charles M. Lacy, trustee of the Bushnell Trust under a declaration of trust dated September 27, 2005; Iqbal Quadir; Samina Quadir; and Bank of America, N.A., intervener. Bank of America has not participated in this appeal.

interfered with those rights.  After resolving some issues by summary judgment, a Land Court judge conducted a trial and issued a judgment declaring the scope and extent of the defendants' easement rights.  We affirm.

Background.  a.  Development of the property.  In 1958, Marshall and Rena Bushnell owned all of the property at issue. The land was situated on a hill and improved with a mansion constructed in 1891.  Access to the mansion from the public way, Waltham Street, was by a winding driveway that ended near the mansion.  This driveway is at the center of this litigation.

In 1958, the Bushnells recorded an "ANR plan" -- a plan that did not require approval under the subdivision control law -- showing three lots:  lot $B^1$, lot $B^2$, and lot $B^3$ (the 1958 ANR plan).  Lot $B^2$ contained 3.19 acres and included the mansion, and lot $B^1$ contained 7.21 acres to the north and west of lot $B^2$ and included most of the driveway.[4]  The driveway is shown on the 1958 ANR plan as meandering northwesterly from Waltham Street to a point on lot $B^1$ where it essentially does a U-turn, and proceeds southerly to lot $B^2$.  This U-turn has been referred to by the parties as the "hairpin turn," and by the judge as a "switchback."  It now fronts the plaintiffs' home.

_____

[4] A third lot, lot $B^3$, is also shown on the 1958 ANR plan as an arrow-shaped lot containing 6,700 square feet abutting a portion of the driveway.  That sliver of property is not at issue in this case.

2

On September 19, 1958, the Bushnells sold lot B[2], including the mansion, to the Bridgmans, one of the defendants' predecessors, with an express easement over the driveway that provided as follows:

> "The above-described premises are conveyed, together with a right to use and maintain the driveway as shown on said plan <u>in common with the owners of Lot B[1] and the owners of the parcel shown as Karl S. Marshall</u>[5] on said plan for all purposes for which streets and ways are commonly used in the Town of Lexington." (Emphasis added.)

Thereafter, further development of lot B[1] took place. In 1960, the town took the beginning of the driveway to create Worthen Road running in a northwesterly direction from Waltham Street and, in 1967, the planning board approved a subdivision of lot B[1] into lots numbered 1 through 6, whereby the southeastern portion of the driveway from Worthen Road was replaced by "Bushnell Drive," which ended in a cul-de-sac. From the northwestern end of the cul-de-sac, the original driveway continued in a loop (the hairpin turn) over lot 3 to the original lot B[2] that housed the mansion. That plan was recorded on January 3, 1968 (the January 1968 plan). Lots 1-2 and 4-6, as shown on the January 1968 plan, each contained between 18,000 and 20,500 square feet.

---

[5] The Marshall property is shown on the 1958 ANR plan as abutting Waltham Street to the southeast and the driveway to the northwest. There are no issues involving the Marshall property in this case.

Lot 3 on the January 1968 plan contained approximately 4.5 acres and a large portion of the remaining original driveway.

In October of 1968, lot 3 was further divided into lot 3-A, containing 2.77 acres, and lot 3-B, containing 1.61 acres (October 1968 ANR plan).[6] Lot 3-B was rectangularly shaped and shared a long common boundary with lot B$^2$, the mansion lot. Interestingly, the driveway from Bushnell Dr. was not shown on this plan and the plan reflects that "[w]hereas Lots 3-C and 3-B are not separate building lots" approval under the subdivision control law was not required. Notes on the plan also reflected that lot 3-B was "to be conveyed to" the Kanters, who earlier had purchased lot B$^2$, the mansion lot, from the Bridgmans.[7] Indeed, the Kanters took lot 3-B from that lot's then owner, the Bushnells, "subject to a driveway easement of record for the benefit of the land of the grantees," and with the benefit of a water and sewer easement over lot 3-A, and with the restriction that no dwelling could be constructed on lot 3-B prior to October 30, 1978. The judge found that "the Bushnells and the Kanters agreed to the conveyance of [lot 3-B] to give the Kanters the ability to build a second, additional residence on

---

[6] The plan also showed lot 3-C, a small 4,133 square foot lot in the southwest corner of lot 3B. Notes reflected that lot 3-C was to be conveyed to another couple, the Shrocks.
[7] According to certain documents recorded in the Middlesex South Registry, of which the judge took judicial notice, the Bridgmans conveyed original lot B$^2$ to Irving and Gladys Kanter in 1966.

4

the Kanters' lands, including their new" lot 3-B.  The judge further found that Mr. Kanter later "explained to Mr. Moriarty the 'pressure' Kanter was under in the late 1960s to build a second house near the mansion for his daughter.  The result was the Kanters' purchase of Lot 3-B."  In addition, the judge found that although there was a restriction against building an additional home within ten years on lot 3-B, the water and sewer easement benefitting lot 3-B "evidences an intent for a dwelling to be constructed on Lot 3-B <u>after</u>" the ten-year restriction expired.

Together, the defendants currently own lot B[2] (the mansion lot) and lot 3-B, the lot lines of both of which were reconfigured in 2002 when their predecessors recorded an ANR plan that combined all but the southeast corner of the mansion lot and a sliver of lot 3-B to create lot 10D, containing 127,350 square feet and including the mansion.  In addition, a rectangular portion of the southeast corner of lot B[2], with frontage on Waltham Street, was connected to a large rectangular portion of lot 3-B by an extension of the driveway on lot B[2] to create lot 10E, containing 82,391 square feet.

Defendants Iqbal and Samina Quadir own lot 10D; the defendant trustee of the Bushnell Trust, of which the Quadirs are the beneficiaries, own lot 10E.  As none of the issues turn

on the exact ownership interest, we refer to them collectively as the defendants or the Quadirs.

b. <u>Procedural posture</u>.  Moriarty and McPhillips purchased lot 3-A on December 29, 1993.  The parties had disagreements regarding the driveway when each sought to modify it to improve their properties.  The Quadirs presented to the plaintiffs a plan to modify the driveway but did not seek approval from the town for the plan.  Moriarty and McPhillips rejected the plan.

Moriarty and McPhillips commenced this action in the Land Court seeking a declaratory judgment that the defendants' use of the common driveway for an additional house will overburden, overload, and exceed the scope of the easement (count 1).  The Quadirs filed an answer and several counterclaims.  The Quadirs sought a declaratory judgment that they are entitled to (i) use the driveway for all purposes for which streets and ways are commonly used in the town, (ii) develop lot 10E for residential purposes, and (iii) improve the easement by bringing the driveway up to code and making it safe for emergency and other large vehicles to traverse.  They also claimed that they had acquired an easement by prescription (counterclaim II);[8] and claimed that the plaintiffs had "trespassed" on the easement by placing boulders and other impediments along the driveway and

---

[8] The judgment dismissed counterclaim II with prejudice and the Quadirs make no argument related to it on appeal.

6

constructing an addition to their home that encroached upon the easement (counterclaim III).

Certain issues were resolved at summary judgment; the judge ruled that "in 1968, when the Bushnells conveyed to the Kanters Lot 3-B, implied within that grant was an easement for the benefit of Lot 3-B along the driveway that crossed Lot 3-A at that time." The judge also ruled that the defendants' "latest ANR parcels" -- lots 10D and 10E -- have easement rights and that trial would determine their scope and extent.

The judge stated that following the summary judgment ruling, four issues remained for trial: (1) the location of the implied 1968 easement; (2) whether that easement included the right to construct and access a single-family residence on lot 10E; (3) whether plaintiffs had unreasonably interfered with the Quadirs' rights under that easement; and (4) whether the plaintiffs had unreasonably interfered with the Quadirs' rights under the 1958 driveway easement. After trial, the judge concluded that the implied 1968 easement was in the same location as the 1958 easement; that the notation on the 1968 plan that "Lots 3-C and 3-B" are not separate building lots points out only that lot 3-B was not at the time of conveyance a lawful separate building lot but could become so after the expiration of the deed's express restriction; and that the Quadirs had proved that the Bushnells and the Kanters intended

7

the 1968 easement to be "for such purposes that are reasonably necessary for construction of (and later access to) a single-family residence on Lot 3-B." The judge also concluded that the width of the driveway is presumed to be "a convenient width for all the ordinary uses of free passage to and from [the landlocked] land" (quotation omitted). Finally, the judge held that the plaintiffs had not yet interfered with the Quadirs' 1968 easement and that although the plaintiffs had interfered with the Quadirs' 1958 easement rights in two respects, those impediments had been removed. The judge rejected the argument that the plaintiffs' refusal to agree to improvements to the driveway suggested by a landscape architect constituted interference with the driveway easement where the plan did not show the minimum requirements needed to assure safe access to lot 10D and the mansion. He also concluded and declared that the Quadirs' right to use and maintain the 1958 easement included the right to place gravel, clear brush and limbs, change the easement's grade, or realign it for travel-safety reasons, so long as the improvement is "reasonably necessary for enjoyment of the dominant estate" and "does not 'unreasonably increase the burden on the servient tenement [quotation omitted]." Finally, the judge concluded that the Quadirs have the right to widen the easement "if reasonably necessary for the enjoyment of [the dominant estate] and so long as such

improvements do not unreasonably increase the burden of the driveway on [the servient estate]."

Discussion.  "We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law."  Assad v. Sea Lavender, LLC, 95 Mass. App. Ct. 689, 693 (2019) (quotations omitted).  After trial, we review factual findings for clear error; a judge's findings of fact "must stand if warranted on any view of the evidence and all reasonable inferences therefrom."  Norton v. West, 8 Mass. App. Ct. 348, 350 (1979).  See Blakeley v. Gorin, 365 Mass. 590, 600 (1974) (specific finding adequately supported by the evidence must be accepted "as final and true" [quotation omitted]).  "We review the judge's determination regarding the existence of an easement in private ways under a 'clearly erroneous' standard." Perry v. Nemira, 91 Mass. App. Ct. 12, 16 (2017).  We review questions of law de novo.  Trace Constr., Inc. v. Dana Barros Sports Complex, LLC, 459 Mass. 346, 351 (2011).

We reach only the issues argued by the parties in their briefs.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

1.  The 1968 implied easement.  The judge found that the Quadirs have an easement by implication over the driveway on lot

9

3-A, in the same location as the 1958 driveway.  In essence the plaintiffs argue that there was no need for the judge to declare that there was an implied easement created by the 1968 conveyance of lot 3-B to the Kanters because "[w]ith an expressly granted legally and physically existing driveway access easement benefitting and leading to lot 3-B in place, there was no basis in fact or law for creation of another one in the same location" in 1968.  They further argue that "the Kanters' right to use the 1958 Easement for access to and egress from Lot 3-B, which was appurtenant to lot [B[1]] from which it was derived, was included in the conveyance of Lot 3-B to them.  No additional easement could have been created in the same location and for the same purpose in 1968."

There can be no question that the portion of lots 10E and 10D that is comprised of lot B[2] has an express easement pursuant to the 1958 deed.  That easement did not change when lot 3 was divided into lots 3-A and 3-B.  Moriarty and McPhillips do not contend otherwise.  And it is true that the deed that created the original driveway easement indicates that the driveway easement also benefitted lot B[1].  However, when lots 3-A and 3-B were held as a single lot by a common owner, the single lot could not have an easement over itself.  But, as the judge noted, "[a]n implied easement (also known as an 'easement by implication') can be created by operation of law when the

10

ownership of a unified property is severed into two adjacent parcels." Lavoie v. McRae, 102 Mass. App. Ct. 14, 19 (2022). "The controlling question is whether the circumstances of the severance demonstrate that the parties intended that the owner of one of the resulting parcels be able to make some use of the other parcel even though no express easement was recorded. . . . Such an intent generally will be found only where the parties seeking to benefit from the easement can prove that it is 'reasonably necessary' for their use and enjoyment of their land." Id. at 19-20, quoting Supraner v. Citizens Sav. Bank, 303 Mass. 460, 464 (1939). Here, lot 3-B would be landlocked without an easement over lot 3-A. "Where absolute physical necessity is shown, such proof alone generally is sufficient to find that an implied easement was created." Lavoie, 102 Mass. App. Ct. at 20.

The plaintiffs point out, however, that when lot 3-B was separated from lot 3-A, lot 3-B was granted a sewer and water easement over a portion of lot 3-A, connecting Bushnell Drive directly to lot 3-B without the need to traverse the U-turn or any portion of the driveway.[9] Indeed, the driveway was not even

---

[9] The deed separating lot 3-B from lot 3-A provided, for the benefit of lot 3-B, an express right "to [i]nstall and maintain sewer and water pipes within that portion of Lot 3-A shown as Twenty (20) foot sewer and water easement, but in so doing, the grantees or their successors in title must restore said premises to the condition in which they found them."

11

shown on the 1968 plan referred to in the deed that granted lot 3-B to the Kanters. Thus, the plaintiffs in effect contend that we should apply the canon of construction "inclusio unius est exclusio alterius," that is, inclusion of one thing is an implied exclusion of another. See Miles-Matthias v. Zoning Bd. of Appeals of Seekonk, 84 Mass. App. Ct. 778, 789 (2014). Cf. Perry v. Zoning Bd. of Appeals of Hull, 100 Mass. App. Ct. 19, 22 (2021) (canon "must be applied with caution"). In other words, because the drafters provided a utility easement, we understand the plaintiffs to argue, they could not have intended to include any other easement.

The judge, however, appropriately focused on other factors. He noted the trial evidence that indicated it was the Kanters' intent to construct a home on lot 3-B "separate from the Mansion," albeit after 1978, and found that such intent is in fact supported by the water and sewer easement, which would make development easier. In these circumstances, where the sewer and water easement served a very specific purpose unrelated to access by vehicle, we agree with the judge that the inclusion of the sewer and water easement did not demonstrate an intent to eschew an access easement. The parties agreed that, at the time the lots were separated, the driveway ran across the bottom of lots 3-B and through lot 3-A, was actively used to access all of lot 3, and that lot 3-B had no alternative means of egress. The

12

deed, plans, and affidavits support the judge's conclusion that the parties intended that lot 3-B would benefit from an easement across lot 3-A and, thus, we affirm the judge's conclusion that an easement by implication arose over lot 3-A for the benefit of lot 3-B when the lots were separated.

2. Overburdening the easement. The plaintiffs argue that the judge erred in concluding that the use of the implied easement to build a single-family residence on lot 3-B would not overburden or overload[10] the easement. "To overburden an easement means to use it 'for a purpose different from that intended in the creation of the easement.'" Kubic v. Audette, 102 Mass. App. Ct. 228, 230 (2023), quoting Taylor v. Martha's Vineyard Land Bank Comm'n, 475 Mass. 682, 685 n.11 (2016). "It is true that an easement granted in general and unrestricted terms is not limited to the uses made of the dominant estate at the time of its creation, but is available for the reasonable uses to which the dominant estate may be devoted." Kubic, supra at 231, quoting Hewitt v. Perry, 309 Mass. 100, 105 (1941).

---

[10] The term "overload" refers to circumstances where an easement is used to serve land other than that to which the easement is appurtenant. See Taylor v. Martha's Vineyard Land Bank Comm'n, 475 Mass. 682, 685 n.11 (2016). Although the plaintiffs generally assert that construction of a single-family home would also "overload" the easement, they have made no separate argument in support of their contention, and we consider it waived.

13

When lot 3 was created, the other lots on the January 1968 ANR plan were divided into much smaller residential lots. That lot 3 was further divided could not have been unexpected. The parties agreed that lot 3-B was zoned as a single-family residential lot under the town's zoning bylaws in 1968. Nothing seemingly would have prevented constructing a house on lot 3-B after October of 1978. Whether we look at 1958 when lots $B^1$ (3.19 acres) and $B^2$ (7.21 acres) were created, or the January 1968 plan that shows lot 3 as substantially larger than the other lots, or the July 1968 plan showing the division of lot 3 into lots 3-A and 3-B with the specific notation that lot 3-B would be conveyed to the abutters and benefit from a water and sewer easement, we cannot agree that the addition of a single-family home to lot 10E is inconsistent with "normal development" or what "might have been anticipated" for the property. See Bedford v. Cerasuolo, 62 Mass. App. Ct. 73, 83-84 (2004). Where the evidence credited by the judge indicates that the purpose of the transfer of lot 3-B to the Quadirs' predecessor was for the eventual construction of a single-family home, we conclude that the proposal to use the driveway to access a single-family home on lot 10E does not overburden the easement.

3. Right to realign and widen the driveway. Although they do not quibble with much of what the judge declared to be the scope of the defendants' easement, the plaintiffs contend that

14

the judge erred in concluding that the Quadirs may "realign" and "widen" the driveway if "reasonably necessary for enjoyment of Lot B[2] and so long as such improvements do not unreasonably increase the burden of the driveway on the owners of Lot 3-A."[11] The plaintiffs contend that the defendants may not relocate the 1958 easement by realigning it and widening it without the consent of the owners of the servient estate. See M.P.M. Bldrs., LLC v. Dwyer, 442 Mass. 87, 90 (2004) (discussing the Restatement [Third] of Property [Servitudes] § 4.8[3] [2000], which permits a servient estate to make reasonable changes in the location or dimensions of an easement and noting that § 4.8[3] is a default rule, "to apply only in the absence of an express prohibition against relocation in the instrument creating the easement and only to changes made by the servient, not the dominant, estate owner" [emphasis added]).

We disagree that, by declaring that the Quadirs had the right to "realign" and "widen" the easement, the judge authorized the Quadirs to "relocate" the easement. As the judge noted, it is well-established that the holder of an easement has the duty to make repairs and improvements necessary for enjoyment of the easement, so long as the burden on the servient

---

[11] The plaintiffs concede in their reply brief that they do not challenge the defendants' right to grade and make physical improvements to the driveway within the boundaries of the 1958 easement.

estate is not unreasonably increased.  See Guillet v. Livernois, 297 Mass. 337, 340 (1937) (right of way easement held to include right to make it "passable and usable for its entire width, having due regard to the rights and interests of others," following from "general principle that when an easement or other property right is created, every right necessary for its enjoyment is included by implication" [quotation omitted]).

Where the easement consists of a right of way, the easement holder has the right to use the surface for passing and repassing; thus, repairs and improvements necessary for enjoyment of this right of way may include leveling, graveling, ploughing, paving, and other improvements necessary to make the way passable and usable in a reasonably safe manner.  See Chatham Conservation Found., Inc. v. Farber, 56 Mass. App. Ct. 584, 589 (2002) ("the right to pass and repass has been found to include all rights reasonably incidental to the enjoyment of the right to pass, including the right to make reasonable repairs and improvements to the right of way").  See also Mt. Holyoke Realty Corp. v. Holyoke Realty Corp., 298 Mass. 513, 514 (1937) (holder of stairway easement permitted to make repairs that extended beyond stairway as that was deemed reasonably necessary in order to make stairway passable and usable); Barlow v. Chongris & Sons, Inc., 38 Mass. App. Ct. 297, 300 (1995) (holder of driveway easement had right to pave easement and install

16

guard rails); Tindley v. Department of Envtl. Quality Eng'g, 10 Mass. App. Ct. 623, 627-628 (1980) (where right of way easement to river impassable at low tide, easement holder entitled to build foot ramp over right of way as reasonably necessary to permit intended use).

There was no error in the judge declaring that the Quadirs have the right to realign and widen the roadway of the easement to the extent that this may be reasonably necessary for safe passage and as long as such realignment and widening does not unreasonably burden the servient estate. See Hodgkins v. Bianchini, 323 Mass. 169, 172-173 (1948) (1820 grant of right of way in "cart road" did not limit way to width of vehicles then in common use); Glenn v. Poole, 12 Mass. App. Ct. 292, 296 (1981) (flaring out roadway at entrance for safety was within dominant estate's right to make necessary repairs and improvements and so minor as to not inconvenience servient estate). However, as the judge pointed out, whether and to what extent realigning and widening is reasonably necessary for enjoyment of the easement, and whether any such improvements

17

will unreasonably increase the burden on the servient estate, have not been established or determined.[12]

Judgment affirmed.

By the Court (Massing, Ditkoff & Singh, JJ.[13]),

*Joseph F. Stanton*

Clerk.

Entered: August 28, 2023.

---

[12] The plaintiffs contend that the judge erred in concluding that they had interfered with the defendants' 1958 easement.  Where the judge concluded that any impediment to the easement had been removed and declined to issue any orders on this issue, the matter is moot and we need not determine whether the judge's initial factual findings on this issue were correct.

[13] The panelists are listed in order of seniority.