# United States Court of Appeals
## For the First Circuit

No. 10-1542

VERMONT MUTUAL INSURANCE COMPANY,

Plaintiff, Appellee,

v.

DESMOND F. MAGUIRE, JOSEPHINE L. MAGUIRE, BORIS MAGUIRE,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lipez, Circuit Judge,
Souter, Associate Justice,[*]
and Howard, Circuit Judge.

John J.E. Markham, II, with whom Bridget A. Zerner and Markham & Read were on brief, for appellants.
Peter C. Kober for appellee.

October 31, 2011

---

[*] The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LIPEZ**, <u>Circuit Judge</u>.  Boris Maguire ("Maguire") and his parents, Desmond and Josephine Maguire (collectively, "the Maguires"), challenge the district court's determination that Vermont Mutual Insurance Company had no duty to defend a claim made against them by a young man whom Maguire had injured during a bar fight.  The district court concluded that the Maguires' homeowners' insurance policy did not require Vermont Mutual to provide a defense until a lawsuit had been filed, and thus the duty to defend had not been triggered.  The court also held, in the alternative, that Vermont Mutual did not breach its duty to defend.

We agree that Vermont Mutual did not breach its duty to defend, and we therefore affirm on that alternative basis.

**I.**

**A.  The Bar Fight and the Claim**

During his Thanksgiving vacation from college in November 2007, Maguire was socializing with friends in Boston.  After drinking at two other establishments, the group, which included a young man named William Schaetzl, arrived at the Pour House Bar and Grille.  Another group of young adults, including Robert Kalsow-Ramos, was also drinking at the Pour House.  Although the details of what ensued are not clear, the parties agree that what began as an altercation between Schaetzl and Kalsow-Ramos ended abruptly when Maguire hit Kalsow-Ramos in the face with a glass beer mug.  The glass shattered, cutting the side of Kalsow-Ramos's face and

-2-

the muscle, tissue, and saliva duct below. Kalsow-Ramos underwent emergency surgery and recovered, but the incident left him with permanent scars.

Within weeks, Maguire received notice of a criminal hearing at the Boston Municipal Court scheduled for January 4, 2008, to address whether there was probable cause to charge Maguire. The Maguire family retained Attorney Max Stern to represent Boris at the hearing.

When Stern arrived at the courthouse, he met Attorney Paul Rufo, who represented Kalsow-Ramos. Rufo and Stern discussed the possibility of settling any potential civil claims and requested that the hearing be postponed. The hearing was rescheduled for February 29.

On January 9, Rufo sent Stern a letter stating that Kalsow-Ramos intended to seek legal remedies against Maguire. That letter was followed by a more detailed one, dated January 16, in which Rufo outlined his client's view of the facts, enclosed medical records and photographs of Kalsow-Ramos's injuries, and made a formal "demand for settlement of [Kalsow-Ramos's] claim for personal injury." Rufo offered to settle for a payment of $800,000, and stipulated that the offer expired on February 1.

During the subsequent negotiations, Rufo emphasized to Stern that Kalsow-Ramos wanted to avoid participating in any criminal proceedings, and thus he was willing to accept a lower

settlement payment. However, any such settlement had to be finalized before the probable cause hearing on February 29. On February 6, Rufo sent a revised settlement offer to Stern, calling for a $475,000 payment in exchange for release of all criminal and civil liability. The Maguires' new attorney, John Markham, reached an agreement with Rufo on February 12 contingent upon Vermont Mutual waiving a particular provision -- the "voluntary payment" provision, discussed below -- in the Maguires' homeowners' insurance policy. When Vermont Mutual refused to do so, the Maguires and Kalsow-Ramos continued to negotiate. On February 26, they signed an agreement obligating the Maguires to pay $425,000 to Kalsow-Ramos, who agreed not to pursue criminal or civil claims against Boris.[2]

## B.  Vermont Mutual's Involvement

Vermont Mutual had issued a homeowners' insurance policy to Desmond and Josephine that was in effect in November 2007 and covered the Maguires' personal liability for bodily injury in certain specified circumstances. Three provisions of that policy are pertinent here. First, Vermont Mutual was obligated to pay only if the injury was inflicted accidentally. Second, under the so-called "voluntary payment" clause, the Maguires were not

---

[2] Law enforcement officials could, of course, have pursued charges against Maguire without Kalsow-Ramos's endorsement. In that event, the settlement agreement required Kalsow-Ramos to return the $425,000.

allowed, except at their own cost, to make any payments or assume obligations to others in connection with an otherwise covered incident. The third provision set forth Vermont Mutual's defense and indemnity obligations when "a claim is made or a suit is brought against an insured for damages."

Vermont Mutual became aware of the Pour House incident on January 10, when it received Rufo's January 9 correspondence, forwarded by Stern. A claim file was opened and assigned to Mark McGreevy, a claims investigator. McGreevy called Stern to acknowledge receiving his letter and to speak with him about the incident. The following day, Stern forwarded the police report of the incident to McGreevy.

Several days later, on Thursday, January 17, Stern forwarded Rufo's detailed demand letter to McGreevy by email. McGreevy responded within minutes, requesting an interview with Maguire the following week. Without explicitly agreeing to an interview, Stern wrote back on January 18, saying that, "[i]n view of the possibility of a criminal charge, we would need the statement to be attorney-client privileged," and explaining that Maguire had already returned to college in North Carolina.

The following Tuesday, January 22, McGreevy and Rufo discussed the claim. Acknowledging the January 16 demand letter, McGreevy told Rufo that Vermont Mutual did not yet know enough about the case to make an offer and would not be in a position to

-5-

do so by Rufo's February 1 deadline. In the claim file, McGreevy noted that he planned to meet with Rufo on January 28.

McGreevy then visited the Pour House on January 24 and tried to speak with the bar's general manager, who refused on advice of his attorney. Over the next few days, he called various individuals and attorneys, including the police officer who investigated the incident and the insurance carrier for the Pour House.

McGreevy then continued his investigation by calling the witnesses listed in the police report and attending a Boston Licensing Board hearing concerning the incident. Most of the witnesses refused to speak with McGreevy or were advised by counsel against doing so. All told, McGreevy was able to speak to just one witness, who saw only the aftermath of the altercation on the street. McGreevy did, however, hear the testimony of Pour House employees at the Licensing Board hearing, which took place on February 4. He also requested, from the City of Boston, a copy of the transcripts of the licensing hearing and a copy of the incident reports that the bar's attorney provided at the hearing.

On February 4, McGreevy sent Stern a "reservation of rights" letter saying that Vermont Mutual might not pay the claim because the injury might have been intentional, and because Stern had refused to allow McGreevy to interview Maguire. McGreevy explained, however, that Vermont Mutual was "currently

-6-

investigating [the Kalsow-Ramos] claim" and that the company would "continue to handle th[e] claim even though a coverage question exists."

At 5:08 p.m. on February 7, Stern forwarded to McGreevey the February 6 message from Rufo containing the $475,000 settlement proposal. That message stated that, "as with all of [their] previous settlement discussions," Stern should treat the email as privileged. The email also stated that the offer would expire at 9:00 a.m. on February 7. In the cover email to McGreevy, Stern reiterated that Maguire could be interviewed if it were kept confidential and privileged. He also told McGreevy that he was "in possession of the substance of statements of two witnesses who establish that Kalsow-Ramos and his friends -- not Maguire -- were the aggressors in the incident" and that he "wish[ed] to share [the statements] in a privileged manner." To that end, Stern "suggested . . . that Vermont [Mutual] retain counsel and that we establish a joint defense or common interest privilege."

On February 11, Markham, now representing the Maguires, sent McGreevy a letter explaining a proposed settlement that required Vermont Mutual either to pay $450,000 or to waive the "voluntary payment" provision and allow the Maguires to settle directly with Kalsow-Ramos. Stern was apparently still involved in Maguire's representation, because Rufo emailed the "final" settlement term sheet to Stern on February 12. Stern returned an

executed version of the term sheet and a check, dated February 11, from Desmond Maguire for $175,000, to be held in escrow.

On February 15, Attorney Peter Kober, whom Vermont Mutual retained as coverage counsel, sent a letter to Markham stating that his client refused to pay the $450,000 and refused to waive the "voluntary payment" clause. Kober voiced several of Vermont Mutual's objections, including that the proposed settlement might violate public policy and that the settlement amount might not be reasonable.[3] Moreover, Kober reiterated the substance of McGreevy's February 4 letter, saying that Maguire may have acted intentionally and that Vermont Mutual's efforts to investigate the claim were seriously hampered by Stern's refusal to allow an interview with Maguire absent the protection of attorney-client privilege. Kober also objected to the short notice of the settlement offer, which Vermont Mutual felt did not afford sufficient time to "investigate all circumstances necessary for it to respond in an informed manner."

On March 5, Vermont Mutual was told of the February 26 settlement. In May, Markham demanded that Vermont Mutual reimburse the Maguires for the settlement, as well as for their attorney's fees and costs. Kober repeated the concerns that he had

---

[3] Kober explained that the information that Stern had provided up to that point reflected that Kalsow-Ramos's medical expenses to date were $39,287.77, and that there was no information provided to support his claim of $20,000 in future medical expenses.

communicated in February and, simultaneously, filed this declaratory judgment action against the Maguires.

## C.  Procedural History

In its complaint, Vermont Mutual sought a declaratory judgment that it owed no duty to defend or indemnify the Maguires against Kalsow-Ramos's claim.  The Maguires counterclaimed that Vermont Mutual had breached the insurance contract, and that the breach had been in bad faith, see Mass. Gen. Laws ch. 176D & ch. 93A.

At a pretrial conference, the parties agreed with the district court's suggestion to bifurcate the trial by submitting some questions to the jury and then proceeding to a bench trial on the remaining questions.  The jury was asked to determine three issues related to Vermont Mutual's duty to indemnify: whether Kalsow-Ramos's injury was accidental; if so, whether $425,000 was a reasonable settlement amount; and, if it was, whether Vermont Mutual was prejudiced by the Maguires' settlement of the claim without Vermont Mutual's consent.[4]  On the first two questions, the

---

[4] The jury was asked to answer each question by checking "yes" or "no."  If the answer to the first question or the second was no, the jury was told not to address the subsequent question or questions.  If the jury concluded that Kalsow-Ramos's injury was not accidental, Vermont Mutual was not obligated to indemnify the Maguires for the settlement amount; answering the remaining two questions would be superfluous.  Similarly, if the jury concluded that the settlement amount was unreasonable, Vermont Mutual need not show any additional prejudice resulting from the Maguires' settlement of the claim without Vermont Mutual's participation.  The jury made no findings regarding the duty to defend, when it

-9-

jury found for the Maguires: the injury was accidental and the settlement was reasonable.  On the third question, however, the jury found that the settlement prejudiced Vermont Mutual's ability to protect its interests.

The district court then addressed Vermont Mutual's duty to defend the Maguires against Kalsow-Ramos's claim.  Examining the portion of the contract governing when Vermont Mutual was required to provide counsel, it held that the provision created a duty to defend only after a suit had been filed.  It also held that Vermont Mutual "did all it was obligated to do under the policy" because it "took all reasonable investigatory steps in the limited, seven-week timeframe between notice of the claim and the settlement."  Vt. Mut. Ins. Co. v. Maguire, No. 08-cv-10965-RWZ, 2010 WL 1416124, at *5 (D. Mass. Apr. 6, 2010).  Finally, the court held, for a number of reasons, that Vermont Mutual had not exhibited bad faith in failing to defend the Maguires.  The court entered judgment for Vermont Mutual, and the Maguires timely appealed.[5]

arose, or whether it was breached.

[5] The record does not reveal why the district court held the jury trial before the bench trial.  We find the sequence puzzling. Determining the existence of a duty to defend, which turns on a reading of what a third party is claiming, would seem logically to precede the determinations of what actually happened and the implications of what transpired for the duty to indemnify. Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 35 (1st Cir. 1997) ("Under Massachusetts law . . . [t]he duty to defend is antecedent to, and independent of, the duty to indemnify.").  The existence of each duty depends on different evidence, as well. See id.  Moreover, the allocation of the burden of proof on the first

On appeal, the Maguires argue that, under the terms of their homeowners' policy, Vermont Mutual had a duty to provide a defense to Kalsow-Ramos's claim, and that it breached that duty by failing to protect the Maguires when counsel was needed.[6] Vermont Mutual contends that its duty to defend was never triggered, both because no lawsuit was ever filed, and because the Maguires never formally tendered the defense. It also argues that the district

---

question put to the jury -- whether the injury was accidental -- differs depending on whether the insurer breached its duty to defend: if there was no breach, the insured bears the burden of proof; if there was a breach, the burden shifts to the insurer. See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 916 (Mass. 1993). These considerations suggest that the jury trial should have followed the bench trial. Cf. Teachers Ins. Co. v. Schofield, 284 F. Supp. 2d 161, 164 (D. Me. 2003) ("To secure the just, speedy and inexpensive determination of an action involving a duty to defend and a duty to indemnify and avoid a duplication of trials requires that courts proceed in the following order: the determination of a duty to defend, then the determination of liability in the underlying action, and finally the determination of the duty to indemnify." (quoting Penney v. Capitol City Transfer, Inc., 707 A.2d 387, 389 (Me. 1998))); Emhart Indus., Inc. v. Century Indem. Co., 559 F.3d 57, 64 (1st Cir. 2009) (quoting district court's description of its decision to hold a jury trial on the duty to indemnify before a bench trial on the duty to defend as "odd chronology").

[6] The Maguires did not address their bad faith counterclaim in their briefs. At oral argument, counsel stated that such briefing or argument was unnecessary because his clients sought a remand, at which point the bad faith issue could be re-litigated. Counsel was wrong. Because the Maguires failed to assert any argument on the issue of bad faith, the issue is not before us, see, e.g., SEC v. Tambone, 597 F.3d 436, 440 n.3 (1st Cir. 2010) (en banc), and may not be raised on remand, see United States v. Ticchiarelli, 171 F.3d 24, 28-29 (1st Cir. 1999) (explaining that failing to challenge a legal decision on appeal precludes raising it later in the litigation). In any event, given the disposition of this appeal, there will be no remand.

-11-

court's conclusion that there was no breach is based on a number of findings of fact that are not clearly erroneous.

## II.

Although the parties' briefs focused primarily on whether the contractual duty to defend arose in this case, we need not address that issue. We conclude that, even if there was such a duty, Vermont Mutual did not breach it.[7]

The Maguires contend on appeal that Vermont Mutual breached its duty to defend by failing to protect them when counsel was needed to negotiate a settlement. The district court rejected that argument, finding that "Vermont Mutual took all reasonable investigatory steps in the limited, seven-week timeframe [sic] between notice of the claim and the settlement," and that the company "did all it was obligated to do under the policy." According to the court, Vermont Mutual "did not refuse to defend or participate in a reasonable settlement," but rather "decline[d] to move at the speed dictated by the Maguires" and "decline[d] to participate in a settlement it deemed possibly unethical and which was beyond the scope of its contractual obligation."

---

[7] The Maguires suggest that we certify to the Massachusetts Supreme Judicial Court the question of whether, under state law, an insurance company's duty to defend may be triggered in the absence of a lawsuit. Our assumption that Vermont Mutual had such a duty makes it unnecessary to further address the issue. Likewise, we need not consider whether there was a tender of the Kalsow-Ramos claim under Massachusetts law.

-12-

We review the trial court's findings of fact for clear error, and its legal conclusions de novo. Trace Constr., Inc. v. Dana Barros Sports Complex, LLC, 945 N.E.2d 833, 837 (Mass. 2011).[8] Vermont Mutual contends that the district court's finding that there was no breach of the duty to defend was a factual determination that should be reviewed only for clear error. We agree that the question of breach ordinarily turns largely on the facts, see, e.g., Sarnafil, Inc. v. Peerless Ins. Co., 636 N.E.2d 247, 253 (Mass. 1994) (noting "factual considerations" that may determine an insurer's breach of duty), but the standard of review is ultimately of no consequence here. Even considered de novo, the district court's determination of "no breach" must be upheld.

Assuming there was a duty to defend triggered by the demand for settlement, it arose on January 17, when Vermont Mutual received a copy of the detailed Kalsow-Ramos demand letter. Cf. Cont'l Cas. Co. v. Gilbane Bldg. Co., 461 N.E.2d 209, 212 (Mass. 1984) (explaining that existence of duty is determined by comparing third-party allegations and insurance policy). At that point, McGreevy began investigating the claim in earnest,

---

[8] The parties agree that we should apply the substantive law of Massachusetts to their contract dispute, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (federal court sitting in diversity applies substantive law of forum state), and we perceive no basis to do otherwise, see Great Clips, Inc. v. Hair Cuttery of Greater Bos., L.L.C., 591 F.3d 32, 35 (1st Cir. 2010) (accepting parties' "colorable" assumption that Massachusetts law governed contract at issue).

responding to Stern's email containing the demand letter within minutes.  On January 22, less than a week later, McGreevy timely responded to Rufo's demand letter by rejecting the offer to settle for $800,000.[9]  After that point, he continued to investigate the claim diligently by visiting the Pour House, attempting to interview numerous witnesses and speak with attorneys involved in the case, attending the Licensing Board hearing, and obtaining relevant reports and transcripts.  Less than three weeks after receiving the initial demand letter, McGreevy issued the reservation of rights letter that explicitly told the Maguires that Vermont Mutual would continue to handle the claim despite some doubt that coverage existed.

Meanwhile, Stern -- first alone and then together with Markham -- was negotiating a settlement with Kalsow-Ramos and gave Vermont Mutual no notice of such negotiations until February 7, after the reservation of rights letter had been sent on February 4.  Moreover, although Stern forwarded the email with Rufo's new offer of $475,000, made on February 6, the offer had expired eight hours before it was ever presented to McGreevy.  In the same email, Stern reiterated that Maguire could only be interviewed if such communications were privileged, and he revealed that he had

_____

[9] The Maguires do not argue that the rejection of the initial demand violated the insurer's duty to defend or settle the claim.

additional witness statements that he would share with Vermont Mutual only if they, too, were privileged.

After Vermont Mutual learned of the ongoing settlement negotiations in the early evening of Thursday, February 7, it received Markham's letter on Monday, February 11, reporting that a settlement had been reached contingent upon Vermont Mutual either paying the settlement amount or waiving the "voluntary payment" provision. Vermont Mutual's attorney, Kober, responded four days later, explaining why the company would not accept either option and reiterating the company's concern about the time frame and the restricted access to Maguire. Because Vermont Mutual did not agree to either contingency, the final settlement, entered February 26, contained slightly altered terms.[10]

Throughout this unusually condensed timeline, Vermont Mutual took no action that signaled a rejection or abandonment of its responsibility to defend Maguire. Nor did it fail to pursue the claim such that a breach of the duty to defend could be based on the company's inaction. To the contrary, McGreevey actively investigated the incident and told the Maguires that Vermont Mutual would continue to handle the claim. Yet, despite McGreevey's attentiveness and the reassurance of the reservation of rights

---

[10] As noted supra, the final agreement obliged the Maguires to pay Kalsow-Ramos $425,000 in exchange for his agreement not to pursue any claims against Boris. If criminal charges were nonetheless filed, Kalsow-Ramos would be required to return the full payment.

-15-

letter sent on February 4, the Maguires went ahead with negotiations and authorized their attorneys to reach a settlement with Kalsow-Ramos, first on February 11 and ultimately on February 26.

Given this background, the Maguires' assertion that they felt "unprotected" can be based only on Vermont Mutual's communication that it needed more information before it would enter into a settlement. Such investigation of the nature and value of the Kalsow-Ramos claim was not only permissible, but required. See Mass. Gen. Laws ch. 176D, § 3(9)(c), (d), (f) (requiring insurers to "adopt and implement reasonable standards for the prompt investigation of claims," refuse to pay claims only after "conducting a reasonable investigation based upon all available information," and effectuate settlements after "liability has become reasonably clear"). Moreover, although the Maguires contend that Vermont Mutual was obligated to enter the settlement negotiations so as to protect the insureds, the only opportunity the company was given to do so was after the initial demand letter -- when the company did, in fact, enter the discussion by rejecting the $800,000 offer. After that point, the Maguires negotiated through Stern and Markham, disregarding Vermont Mutual's explicit promise to handle the claim.

The reason the Maguires took that step is obvious. If their primary concern had been the civil claim, Vermont Mutual's

statement on February 4 that it was handling the claim would have been a sufficient indication, at least in the short term, that their interests were being protected.  Their main concern, however, was avoiding criminal charges.  The Maguires do not argue that their insurance coverage extended to criminal defense, nor do they posit that Vermont Mutual was obligated to take the possibility of such charges into account in determining the value of the claim and the need to expedite negotiations.  We see no basis for either argument.  Indeed, the latter argument raises the troubling implication that insurance companies have a duty to negotiate aggressively and offer greater amounts as an incentive for third-party plaintiffs -- some of whom may be unrepresented or susceptible to financial coercion -- to drop criminal charges.

The Maguires rely heavily on Sarnafil to support their contention that Vermont Mutual breached its duty to defend.  However, that case reinforces our conclusion that no breach occurred here.  In Sarnafil, the insured, Sarnafil, sought to be reimbursed for the expenses it incurred in defending an arbitration with a third-party claimant.  On September 27, 1984, Sarnafil forwarded to its insurance company a letter from the third party alleging that Sarnafil was liable for certain repair costs.  On October 4, the insurer sent a reservation of rights letter that "promis[ed] a prompt investigation."  636 N.E.2d at 250.  Material in the record, however, indicated that the insurer, Peerless, "made

-17-

no investigation." Id. In addition, while Sarnafil "repeatedly [sought] Peerless's acknowledgement of coverage" throughout October and early November, it received no response until November 20 -- at which point Peerless wrote that "it was engaged in a 'comprehensive review and analysis of the coverage questions.'" Id.

The Massachusetts Supreme Judicial Court held that, on the record before it, the insurer's responsibility for the arbitration expenses was a matter for a fact finder. The court noted that

> [a]n insurer which reserves its rights and takes no action in defense of its insured, when it knew, or should have known, of a covered claim, or which fails to investigate diligently, despite repeated claims of coverage and requests for a defense from an insured facing demands for immediate action, could be found to have committed a breach of the duty to its insured.

Id. at 253.

The facts here are a far cry from the scenario depicted by the court in Sarnafil. Vermont Mutual did not merely reserve its rights and then fail to conduct an investigation. To the contrary, it acted quickly and diligently to uncover the facts relating to the incident and the value of the claim. On this record, we see no basis for concluding that Vermont Mutual breached any duty to defend that may have existed.

**III.**

Because Vermont Mutual did not breach its duty to defend -- assuming such a duty existed here -- it is not obligated to reimburse the Maguires for the amounts they paid to "defend," or, to be more precise, "negotiate" the Kalsow-Ramos claim. It is also relieved of any obligation to reimburse the Maguires $425,000 for the settlement because that settlement was a "voluntary payment" that was expressly forbidden by the policy.[11]

The judgment of the district court is affirmed.

So ordered.

---

[11] A showing of actual prejudice may be required when an insurer seeks to disclaim coverage based on its insured's violation of a policy provision, though the showing has been held unnecessary where the insurer had no opportunity to protect its interests. See Augat, Inc. v. Liberty Mut. Ins. Co., 571 N.E.2d 357, 360-61 (Mass. 1991) (involving breach of the voluntary payment provision). The issue is academic here as the jury made a finding of prejudice.